**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**GIANCARLO MONTJOY,**

Plaintiff,

v.

**MGT IMPACT SOLUTIONS, LLC,**

Defendant.

Case No. 8:26-CV-2467-JLB-AAS

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

AUG 24 2026 PM1:38
FILED - USDC - FLMD - TPA

Plaintiff Giancarlo Montjoy, proceeding pro se, alleges as follows against Defendant MGT Impact Solutions, LLC ("MGT"):

## NATURE OF THE ACTION

1. This action arises from MGT's termination of Plaintiff eighteen days after he submitted a written EEOC intake requesting protection from retaliation and agency assistance; after he raised written retaliation and pretext concerns; after he requested review by Human Resources, Employee Relations, and Legal; and after he warned that MGT's performance-management timeline crossed a contractual January 31, 2026 cutoff.

2. The cutoff created a concrete economic conflict. Plaintiff's written Employment Agreement provided a qualifying first-year termination benefit equal to six months of base salary—$86,262.50—plus up to six months of group-health continuation at the employee premium rate. MGT kept a thirty-day PIP open



TPA74771
$405

beyond the cutoff and terminated Plaintiff on February 9, nine days after the protection expired but three days before the PIP was scheduled to end. Plaintiff does not allege that timing alone created severance liability.

3. Plaintiff asserts five counts: Count I, retaliation under Title VII; Count II, breach of Section 4's termination-process and notice-and-cure obligations if MGT relies on a Section 4.2 ground or the contractual performance process it invoked; and Count III, pleaded alternatively if MGT characterizes the termination as post-protection and at will, for wrongful prevention or hindrance of the first-year transition benefit if discovery shows material pre-cutoff advancement, deliberate delay, or administration of the process to permit the protection to lapse.

4. Counts IV and V address FY25 bonus, FY26 merit, and retention compensation. Count IV seeks enforcement of post-effective written bonus obligations, any approved or otherwise payable merit adjustment, and 2025 EIU obligations. Count V alternatively governs any material discretion MGT claims over bonus or merit eligibility, good standing, historical allocation standards, salary-review administration, annual-assessment finalization, or EIU grant administration. The theories and remedies are pleaded in the alternative under Federal Rule of Civil Procedure 8(d), without duplicative recovery.

## PARTIES

5. Plaintiff Giancarlo Montjoy is a citizen of Florida, domiciled in Wilton Manors, Broward County. He worked remotely in Florida as Director of Product Marketing.

6. Defendant MGT Impact Solutions, LLC is an active Florida limited liability company with its principal office at 4320 West Kennedy Boulevard, Suite 200, Tampa, Florida 33609.

7. At all relevant times, MGT Impact Solutions, LLC was Plaintiff's employer and an employer within the meaning of Title VII. MGT's October 3, 2025 company-wide announcement reported an enterprise workforce of approximately 1,100 employees. Plaintiff alleges, on information and belief, that the named respondent employed more than 500 employees in each of twenty or more calendar weeks during the relevant statutory period. The precise statutory legal-entity headcount is within MGT's possession and control.

## JURISDICTION AND VENUE

8. This Court has federal-question jurisdiction under 28 U.S.C. Section 1331 and 42 U.S.C. Section 2000e-5(f)(3) because Count I arises under 42 U.S.C. Section 2000e-3(a).

9. This Court has supplemental jurisdiction over Counts II through V under 28 U.S.C. Section 1367 because the contract claims form part of the same case or controversy.

10. Venue is proper in the Tampa Division because MGT maintains its principal office in Tampa; relevant Human Resources, Legal, finance, management, and employment records were maintained or administered through MGT's Tampa operations; and the Employment Agreement selects state and federal courts in Tampa, Hillsborough County, Florida.

11. MGT is subject to personal jurisdiction in Florida and may be served through its registered agent, C T Corporation System, 1200 South Pine Island Road, Plantation, Florida 33324.

## ADMINISTRATIVE PREREQUISITES

12. On January 22, 2026, while still employed, Plaintiff submitted a four-page Online Inquiry Details form through the EEOC's online process. It identified Plaintiff and MGT, was assigned Inquiry Number 510-2026-03990, listed retaliation as the complaint reason, described ongoing performance escalation and threatened discipline, and expressly requested protection, cessation of retaliation, restoration of compensation opportunities, and EEOC assistance including mediation. A copy is attached as Exhibit A.

13. After termination, Plaintiff completed the EEOC process. On July 23, 2026, he signed Charge of Discrimination No. 510-2026-03990 against MGT. The charge identifies retaliation and covers the course of conduct through the February 9 termination. A copy is attached as Exhibit B.

14. The EEOC issued its Determination and Notice of Rights on July 23, 2026, and Plaintiff received it that day. A copy is attached as Exhibit C.

15. This action is filed within ninety days after receipt of the Notice of Rights. All conditions precedent to Count I have been performed, have occurred, or have been excused.

## GENERAL FACTUAL ALLEGATIONS

### Written Employment, Compensation, Transition, and Retention Terms

16. The Tambellini Group hired Plaintiff as Director of Product Marketing effective October 30, 2024. MGT acquired The Tambellini Group effective January 31, 2025 and became Plaintiff's employer. Vicki Tambellini, founder and Chief Executive Officer of The Tambellini Group, later became Plaintiff's direct manager and principal business-unit decisionmaker concerning his performance and compensation.

17. MGT delivered Plaintiff a written Offer Letter and accompanying Employment Agreement in the same DocuSign package as part of the acquisition.

The Agreement identifies MGT Impact Solutions, LLC as Plaintiff's employer. The Offer Letter, Employment Agreement, and Addendum A are attached as Exhibit D.

18. The Agreement set Plaintiff's annual base salary at $172,525. The Offer Letter stated that subsequent salary reviews would be conducted in accordance with MGT's annual performance-evaluation structure, provided a performance-target bonus opportunity of up to $52,000, and stated that FY25 allocations for leaders of The Tambellini Group would be calculated under historical standards used by The Tambellini Group.

19. Section 4.1 provided a qualifying first-year termination benefit of six months of base salary—$86,262.50—and up to six months of group-health continuation at the employee premium rate. Addendum A stated that a qualifying termination without Cause during the first year could trigger that benefit, while a termination after the first year ordinarily resulted in payment only of Accrued Obligations. The cutoff was January 31, 2026.

20. Section 4.3 conditioned amounts above Accrued Obligations on timely execution and nonrevocation of a separation agreement and release. Before the cutoff, Plaintiff proposed a negotiated separation, offered a standard release and orderly transition, and remained ready and willing to execute an appropriate release. The proposal did not itself trigger the benefit, but it gave MGT actual

notice of the cutoff and Plaintiff's willingness to satisfy the release condition in connection with a qualifying separation.

21. Section 4.1 defines Accrued Obligations to include outstanding expenses and earned, unpaid wages and bonuses, payable regardless of whether MGT asserts Cause or the first-year protection had expired.

22. Section 1 describes the employment term as ending pursuant to Section 4, and Section 14 states that the at-will relationship is subject to Section 4. Section 4.2.1 permits performance-based termination for Cause only after reasonable written notice and failure to cure identified defects within thirty days.

23. Other Cause provisions contain distinct safeguards. Section 4.2.2 addresses a valid and legal Board directive and requires a ten-day cure notice; Section 4.2.6 addresses willful malfeasance or misconduct and ordinarily requires cure notice absent severe, egregious, or immediately threatening conduct; and Section 4.2.8 requires written notice of a material breach and a specific reasonable cure. The Agreement defines willfulness in terms of bad faith or lack of a reasonable belief that the conduct served MGT's interests.

24. Section 16 preserves the employee's right to report suspected unlawful conduct to an administrative agency and participate in an agency investigation.

25. On March 21, 2025, MGT advised Plaintiff in writing that he was eligible for up to two retention awards under its LTIP, in the form of Employee Impact

Units, with a total two-year target value of $50,000. The communication stated that a 2025 award "will be granted" if Tambellini achieved its 2025 targets and Plaintiff remained employed through the grant date, and that awards would issue after finalization of the annual assessment. It separately stated that EIUs do not immediately convert to cash and may produce financial value only at a future company-wide event, such as a sale or liquidity event, provided the participant remains employed through that event. Tambellini achieved its 2025 targets, and Plaintiff remained employed through February 9, 2026. MGT controls the assessment, grant, approval, plan, and award-agreement records. Plaintiff does not allege that a liquidity event occurred, immediate cash was due, the full $50,000 vested, or the 2026 award vested.

26. All conditions precedent to Counts II through V have occurred, have been performed, have been waived, or were prevented or excused by MGT.

**Performance, Compensation, and the Contractual Cure Process**

27. Vicki Tambellini supervised most of the period later evaluated, authored the November Performance Notice and January 2026 performance review, directed Plaintiff's reporting change to newly arrived Kevin Turner, and, based on Plaintiff's direct communications and contemporaneous understanding, made or materially recommended his FY25 bonus and FY26 merit outcomes. On information and

belief, she supplied information or assessments considered in the PIP; its drafting and approval history is within MGT's control.

28. Before the notice, Vicki Tambellini accused Plaintiff of working two jobs because his LinkedIn profile had not been updated. Plaintiff denied the accusation, explained a safety concern about publicly identifying his employer, and updated the profile; the notice acknowledged the correction. On October 3, 2025, MGT announced that its centralized Marketing team had been considerably reduced. By October 6, after Tiffanie Reynolds wrote that MGT had "killed the team" and identified departed marketing personnel, Plaintiff understood that MGT had eliminated or substantially dismantled the centralized Marketing function. Reynolds's MGT employment and weekly corporate-marketing meeting ended on October 3, and no successor meeting was identified. The announcement and related information made Plaintiff extremely concerned about the future of marketing and his own future with MGT. Plaintiff recalls emailing Vicki Tambellini on October 6, in substance, that MGT did not appear to value marketing and asking about marketing's future. Vicki responded in substance that MGT did value marketing but was prioritizing lead generation and the Intensify AI pilot. Plaintiff does not presently possess the original email and pleads its wording in substance. The response did not resolve Plaintiff's concern about job security. Plaintiff pleads this

exchange as management and motive context, not as standalone Title VII-protected activity.

29. On November 14, 2025, Vicki issued Plaintiff a Performance Notice expressly invoking Section 4.2.1, establishing a thirty-day cure period, and warning that failure to cure could result in termination for Cause without severance. Vicki, with Human Resources' involvement, represented orally and in writing that the notice was not a PIP, was intended to avoid a PIP, and could end the process if successfully completed.

30. At a November 17 meeting, Plaintiff sought clarification and attempted to correct allegedly inaccurate or incomplete assertions. Vicki responded in substance that his questions illustrated that he was "difficult and defensive," and Carmen West responded in substance that leaders sometimes must listen, accept criticism, and take accountability. Plaintiff understood that questions were being treated as additional evidence against him and stopped pressing them to avoid escalation.

31. During the November 14-December 14 cure period, Plaintiff met weekly with Vicki. She did not identify an item as uncured, state that she was dissatisfied, or tell him he had failed. MGT held no dedicated conclusion meeting and issued no itemized cure determination.

32. Several notice items had already been corrected, could no longer recur, or lacked defined standards. The LinkedIn issue was corrected; Reynolds's meeting

no longer existed; no post-notice recurrence or business harm was identified concerning the alleged internal mispronunciation of "Peertelligent"; and MGT supplied no template, criteria, submission requirement, or evaluation method for the requested pre-delivery QA checklist.

33. Plaintiff also completed or was already performing core requested actions. He created a Salesforce marketing dashboard that Vicki reviewed and accepted as "ok," while explaining structural attribution limits later raised to MGT integration personnel. He already held weekly one-on-ones with each direct report and a structured weekly team meeting, had presented a ninety-day onboarding plan for Jessica Brown, maintained regular coordination with Hampton Shive, and completed a client-and-prospect webinar calendar that Vicki approved.

**Reporting Change, Compensation Decisions, and January PIP**

34. On December 8-9, Vicki changed Plaintiff's anticipated reporting line from Hampton Shive to Kevin Turner and announced Kevin as a newly arrived Co-General Manager in his first days with Tambellini. Kevin had not managed Plaintiff during the evaluated period. Hampton Shive wrote on December 9 that Vicki had negotiated Tambellini's CY2025 bonus pool in the purchase agreement; that the plan was not subject to MGT's FY25 financial performance; and that CY25 performance bonuses remained scheduled for the final December payroll. Tambellini achieved its 2025 goals, and its separate CY2025 pool was fully

funded. MGT manager materials likewise stated that combination groups, including Tambellini, operated under pre-negotiated methodologies separate from MGT's AIP. Vicki administered the process and requested manager percentage recommendations.

35. In December 2025, MGT introduced Tambellini's first formal reduced-scope review framework and stated that it could affect FY26 compensation but "will not impact bonus payments for CY25." MGT did not provide Plaintiff a defined scoring matrix, calibration standards, or performance indicators explaining how ratings or compensation would be calculated.

36. When the cure period ended, neither Vicki nor MGT identified a specific noticed defect as uncured. Because Vicki had represented that the notice could conclude the process and no failure finding was communicated, Plaintiff reasonably understood the corrective process had ended without a failure determination.

37. During a routine December 19 one-on-one, Kevin acknowledged reading the notice but did not state that it remained open, that any item was unmet, or that Plaintiff had failed.

38. Plaintiff completed the 2025 performance period and remained actively employed when MGT processed Tambellini bonuses. On information and belief, other eligible employees, including Plaintiff's direct reports, received bonuses,

while Plaintiff received none. MGT also assigned him a zero-percent FY26 merit increase and no retroactive merit pay without a contemporaneous explanation. MGT's written manager guidance stated that FY26 merit increases would occur, would be effective October 1, 2025, and that eligible employees would receive retroactive pay on December 23 and a merit-adjusted salary beginning January 2. MGT did not contemporaneously identify the criteria or determination that produced Plaintiff's zero-percent result or state that no adjustment had been approved.

39. On January 12, 2026, MGT issued Plaintiff a formal PIP through Kevin. It stated a thirty-day period ending February 12, but asserted that MGT could act earlier if significant, sustained improvement was not occurring or an intervening issue arose. Plaintiff did not sign or agree to it.

40. Plaintiff does not know who drafted, revised, supplied allegations for, reviewed, or approved the PIP. It imposed substantial forward-looking 2026 deliverables—including an integrated marketing plan, Summit plan, case-study goals, scorecards, KPIs, campaign execution, and cross-functional workflows—several of which were not framed as remediation of a specific uncured November defect and could not reasonably be evaluated before January 31. One PIP deliverable required Plaintiff to "Lead the Intensify Platform AI marketing pilot for the OG" and launch it by the end of January—the same initiative Vicki Tambellini

had cited in response to Plaintiff's October 6 concern after the centralized Marketing team had been eliminated or substantially dismantled. In light of the restructuring and the loss of Tiffanie Reynolds's team, Plaintiff contemporaneously understood the pilot as potentially automating or replacing marketing functions and viewed the requirement as heightening his concern about his role and future. Plaintiff pleads that understanding as his contemporaneous concern and context, not as an established statement of MGT's purpose.

41. Vicki authored Plaintiff's January review. The review was mixed: it included positive and adverse ratings, acknowledged that Plaintiff had united the marketing team, credited management improvements, and identified several matters as future 2026 development goals. The notice, FY25 bonus and FY26 merit decisions, PIP, review, and first January 21 meeting warning preceded the January 22 EEOC activity and are alleged as contract-related conduct, background, motive, and possible pretext—not as retaliation caused by later activity.

**Separation Proposal, EEOC Activity, and Termination**

42. On January 14, before the protection expired, Plaintiff sent Kevin Turner and Vanessa Williams a written objection and proposed negotiated separation, with Carmen copied. He stated that he would not sign the PIP acknowledgment but clarified that this was not a refusal to engage constructively. He requested six months of salary under Section 4.1, employee-rate health continuation, a standard

release, and an orderly transition, and offered knowledge transfer, business-continuity assistance, and support for his team. MGT neither accepted nor countered the proposal or supplied a release before January 31.

43. Plaintiff continued working and completing assignments. He attended a routine January 21 one-on-one with Kevin and supplied requested MQL, campaign, retention, and case-study materials on January 22; Kevin's written follow-up identified several items as received or completed.

44. On January 21, after an updated meeting changed from an ordinary one-on-one into a formal review and PIP proceeding involving Human Resources and an outside participant, Carmen wrote that attendance was mandatory, "not optional," and nonparticipation would be treated as insubordination. Plaintiff had not previously been given a policy stating that a live review format was a condition of employment.

45. On January 22, Plaintiff reiterated that he objected to compulsory live performance adjudication but remained available to perform his role, conduct ordinary business, and address disputed matters in writing. A calendar receipt confirmed that he declined the rescheduled meeting consistently with that position. On that same date, while still employed, he submitted the EEOC Online Inquiry. The precise sequence within January 22 is not presently known.

46. Plaintiff completed the intake on his MGT-issued laptop, downloaded the inquiry record, and saved a copy in a work OneDrive folder synchronized to MGT's environment. MGT administered the device, account, and audit records. Plaintiff does not allege that technical access alone proves anyone opened the file.

47. The January 23 meeting proceeded without Plaintiff. On January 27, Carmen documented the absence as noncompliance and stated that live performance management was a condition of employment, that Plaintiff could not dictate meeting format, and that further nonattendance could result in discipline up to termination before the PIP end date. Plaintiff disputed that he had refused to work, requested senior Human Resources and Legal review, and remained available for ordinary work and written communication.

48. Later on January 27, Plaintiff escalated to Chantal Tambe and Shantell Monreal-Caride, with Carmen copied. He stated that the November corrective loop had closed without an identified uncured defect, compensation consequences lacked a predicate determination, a new framework had been substituted without defined standards, and continued escalation compounded "retaliation and pretext risk." He requested senior Human Resources and Legal review and identified the January 31 cutoff and PIP extension as a "run-the-clock" conflict.

49. On January 29, Chantal acknowledged that Employee Relations and Legal were reviewing Plaintiff's concerns, with Carmen copied. No MGT representative

interviewed Plaintiff or communicated a completed outcome before or after termination. That day Plaintiff also escalated to senior finance executive Carla Luke, with Chantal and Carmen copied, identifying the cutoff, PIP timing, retaliation and contract-interference exposure, and an EEOC process as a consequence of continued enforcement or termination.

50. By January 29, senior Human Resources, Employee Relations, Legal, finance, and management personnel had direct written notice that Plaintiff asserted retaliation, sought employment-law review, challenged the timing, and anticipated EEOC enforcement. Plaintiff did not directly state before February 9 that he had completed the January 22 submission because, after the interactions described above, he had lost confidence that MGT and Human Resources would address his concerns in good faith and believed external assistance through the EEOC was necessary. He does not allege that the EEOC formally served MGT before termination. Plaintiff pleads his loss of trust as his contemporaneous reason for seeking outside assistance, not as proof of any particular MGT representative's intent.

51. Before termination, no MGT representative mentioned the EEOC portal activity, inquiry number, downloaded record, or OneDrive location. Plaintiff therefore does not allege a direct admission of knowledge. On information and belief and subject to discovery, one or more persons who made or materially

influenced the termination acquired actual knowledge through synchronized-file access, internal routing, Employee Relations or Legal review, or related communications. Alternatively, a person with knowledge of Plaintiff's protected opposition materially influenced, recommended, approved, or ratified the termination. The relevant access, routing, communication, and decision records are within MGT's control.

52. After January 22, MGT proceeded with the meeting process, characterized nonattendance as noncompliance, newly described live performance management as a condition of employment, renewed meeting demands, and warned of insubordination and termination. Plaintiff continued working, remained available in writing, completed assignments, and accepted ordinary role-level communications.

53. The first-year protection expired January 31 while the PIP remained open through February 12. MGT controlled the PIP dates, administration, and termination timing, but did not communicate a completed PIP or cure determination, identify a noticed defect as uncured, resolve the separation proposal, or communicate a termination decision before the cutoff.

54. On February 9—eleven days after MGT confirmed Employee Relations and Legal review, eighteen days after the EEOC inquiry, nine days after the protection expired, and three days before the PIP end date—Kevin Turner and Carmen West

terminated Plaintiff effective immediately. MGT provided no contemporaneous written Cause determination, uncured-defect finding, completed PIP assessment, or contractual basis.

55. The sequence supports alternative inferences, subject to discovery, that a material termination step was made or substantially approved before January 31 and held for later implementation; that MGT materially advanced a qualifying termination before the cutoff while deferring implementation; and/or that MGT wrongfully administered the performance timeline to permit the benefit to lapse. Plaintiff does not plead those inferences as established facts or rely on timing alone. The decision date, approval chain, drafts, severance analysis, and related communications are within MGT's control.

56. After termination, MGT provided final-pay and property-return materials but no Section 4.1 benefit, release, written termination theory, or Legal contact. Plaintiff repeatedly requested the Cause or at-will basis, any uncured-defect and final PIP findings, termination documents, and the name and contact information of MGT's designated Legal or outside-counsel representative. On February 25, Chantal stated only that MGT stood by a decision based on documented performance issues and an established performance-management process and considered the matter closed. Plaintiff renewed those requests by emails on March

4, March 18, and April 7 and by an April 28 certified letter, but MGT never provided the requested Legal contact or termination documents.

57. Plaintiff has suffered lost wages, retirement contributions, health and other benefits, incentive and retention opportunities, earned but unpaid compensation, emotional distress, reputational harm, and other damages. He has not obtained replacement employment, wages, or consulting income and continues to seek comparable work and mitigate damages.

## DAMAGES AND ALTERNATIVE REMEDIES

58. Plaintiff pleads liability and remedies in the alternative and without duplicative recovery. Under Count I, he seeks statutory back pay, front pay, lost benefits, and other Title VII make-whole relief. Under Counts II through V, he seeks nominal damages and all direct or consequential contract damages legally recoverable, reasonably foreseeable, and proximately caused by the particular breach, including the Section 4.1 benefit, cure-period compensation, any earned bonus, any approved or otherwise payable retroactive merit compensation, other Accrued Obligations, issuance or preservation of any 2025 EIU award, and past or future compensation loss where Florida law permits. Plaintiff does not seek immediate EIU cash conversion absent satisfaction or legally excused nonoccurrence of the governing plan contingencies.

## COUNT I

## RETALIATION IN VIOLATION OF TITLE VII

## (PARTICIPATION AND OPPOSITION PLEADED IN THE ALTERNATIVE)

59. Plaintiff realleges paragraphs 1 through 57, subject to paragraph 41's limitation concerning events preceding January 22.

60. Title VII prohibits an employer from retaliating because an employee made a charge, assisted, or participated in a Title VII investigation or proceeding, or opposed a practice made unlawful by Title VII. 42 U.S.C. Section 2000e-3(a).

61. The January 22 writing identified the parties and challenged conduct, stated "I am filing this charge," and expressly requested EEOC protection, mediation, and remedial action. Although the form recorded that the claim had not "previously" been filed as a charge, the EEOC assigned Inquiry Number 510-2026-03990 and later processed Plaintiff's verified Charge under the same number. Plaintiff alleges that, viewed objectively, the writing constituted a charge or protected participation. See Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1320-21 (11th Cir. 2001). If it otherwise qualified as a charge, the July 23 verification cured any verification defect and related back under 29 C.F.R. Section 1601.12(b). See Edelman v. Lynchburg College, 535 U.S. 106, 118 (2002).

62. Plaintiff relies on his January 27 and 29 communications principally as direct notice that he asserted retaliation, requested employment-law review, and anticipated EEOC enforcement, and as evidence of causation and pretext. Only to the extent those communications opposed retaliation prohibited by Title VII in connection with agency activity does he plead them as protected opposition. He does not rely on generalized unfairness, contract interpretation, compensation disputes, or meeting-format objections as standalone Title VII activity.

63. Carmen received those communications and later participated in the termination. That evidence alone does not prove knowledge of the completed January 22 filing. Plaintiff pleads actual knowledge of the filing only on information and belief, subject to discovery, and alternatively pleads that a person with knowledge of protected opposition materially influenced, recommended, approved, or ratified the termination.

64. After the protected activity and written notice, MGT intensified the mandatory-meeting process, newly stated that live performance management was a condition of employment, threatened termination, maintained the process through the cutoff, and terminated Plaintiff before the PIP end date. The unusually close timing, Plaintiff's continued work, absence of a contemporaneous uncured-defect or early-action finding, shift from a curable non-PIP notice to a future-oriented

PIP, January 31 economic conflict, and refusal to identify the termination theory support causation and pretext.

65. Subject to discovery establishing that a person who made or materially influenced the termination knew of the completed filing, Plaintiff alleges that protected participation was a but-for cause of the final decision, acceleration, approval, implementation, or ratification of the February 9 termination. Alternatively, he alleges that protected January 27 and 29 opposition was a but-for cause of one or more of those actions.

66. As a direct and proximate result, Plaintiff has suffered back pay and lost benefits, including salary, retirement contributions, health coverage, the value of the Section 4.1 benefit to the extent lost because of retaliation, bonus and EIU opportunities subject to governing terms, emotional distress, reputational harm, and other Title VII damages. He seeks front pay where legally available.

67. Plaintiff seeks punitive damages only if discovery proves that managerial employees or senior officials acted with malice or reckless indifference to federally protected rights and MGT did not make good-faith compliance efforts.

## COUNT II

## BREACH OF WRITTEN EMPLOYMENT AGREEMENT

## (SECTION 4 NOTICE-AND-CURE OBLIGATIONS—ALTERNATIVE THEORY)

68. Plaintiff realleges paragraphs 16 through 57.

69. The Employment Agreement is valid, and Plaintiff performed his material obligations and remained ready to perform. He does not allege that every at-will termination required contractual Cause. He alleges that Sections 1 and 14 make the relationship subject to Section 4, MGT expressly invoked Section 4.2.1, and MGT later said the termination rested on documented performance issues and an established performance-management process. If MGT relies on a Section 4.2 ground or that contractual process to justify termination or deny benefits, the conditions attached to the invoked ground apply regardless of a post-termination label.

70. Section 4.2.1 required reasonable written notice and failure to cure identified defects within thirty days. MGT did not identify a specific noticed defect that remained uncured, yet imposed materially new prospective requirements through the January PIP and terminated before its stated completion date.

71. If MGT instead invokes Section 4.2.2, the meeting directions were not identified as Board directives and MGT did not provide the required ten-day cure

notice. If it invokes Sections 4.2.6 or 4.2.8, MGT did not contemporaneously identify severe, egregious, or immediately threatening misconduct permitting termination without cure, provide the required notice for curable misconduct, or give written notice of a material breach and a specific reasonable cure. Plaintiff's continued work and completed assignments bear on whether any alleged failure was willful under the Agreement.

72. MGT therefore breached the applicable Section 4 conditions to the extent it relies on those provisions or the contractual performance process it invoked.

73. Plaintiff seeks nominal damages if breach is proved without larger loss; compensation and benefits during any denied cure period; the Section 4.1 benefit to the extent the breach caused or wrongfully prevented a qualifying first-year termination or release process; affected Accrued Obligations; prejudgment interest; and other direct or consequential damages legally recoverable and proximately caused by the breach, without duplicative recovery.

## COUNT III

## BREACH OF WRITTEN EMPLOYMENT AGREEMENT

## (PREVENTION OF FIRST-YEAR TRANSITION/SEVERANCE BENEFIT —ALTERNATIVE THEORY)

74. Plaintiff realleges paragraphs 16 through 57.

75. This count is pleaded alternatively if MGT contends that it terminated Plaintiff without contractual Cause or on an at-will basis after January 31. Section 4.1 and Addendum A provided $86,262.50 in salary continuation and employee-rate group-health continuation for a qualifying first-year termination, subject to Section 4.3's release condition.

76. MGT controlled the cure process, PIP, approval chain, and termination date and knew the cutoff's economic significance. Before the cutoff, Plaintiff proposed an agreed separation, offered a release and transition, and remained ready and able to execute a reasonable release. The proposal did not itself trigger the benefit but gave MGT actual notice of the cutoff and release condition.

77. MGT acknowledged Employee Relations and Legal review on January 29, communicated no completed cure or PIP assessment or termination decision before the cutoff, allowed the protection to expire, and terminated Plaintiff nine days later and three days before the PIP end date. On information and belief, discovery may show that a material decision was made or substantially approved before January 31 and held; that the termination was materially advanced before the cutoff while implementation was deferred; or that MGT wrongfully maintained or administered the timeline to prevent a qualifying termination and release process. Plaintiff pleads these alternatives as inferences, not established facts.

78. Under Florida's prevention doctrine, a party that wrongfully prevents, hinders, or materially contributes to the nonoccurrence of a condition on which its liability depends may not rely on the nonoccurrence it caused. Plaintiff invokes the doctrine only if discovery proves affirmative wrongful conduct; he does not rely on timing alone, rewrite the cutoff, or allege automatic severance for every post-cutoff termination.

79. Plaintiff was ready, willing, and able to execute a reasonable separation agreement and release within Section 4.3's period if MGT offered or agreed to a qualifying separation. If MGT wrongfully caused the absence of a qualifying pre-cutoff termination or release process, it may not rely on that absence to deny the benefit.

80. Plaintiff seeks $86,262.50 in salary continuation, the economic value of up to six months of employee-rate health continuation, prejudgment interest, and other direct or consequential compensation and benefit losses legally recoverable and proximately caused by wrongful prevention or hindrance, without duplicative recovery.

## COUNT IV

## BREACH OF POST-EFFECTIVE WRITTEN FY25 BONUS, FY26 MERIT, AND RETENTION OBLIGATIONS

81. Plaintiff realleges paragraphs 16 through 41 and 55 through 58.

82. Although the Agreement contains an integration clause, Plaintiff does not rely solely on the original Offer Letter as an independently enforceable promise. He alleges that the Offer Letter identified the FY25 bonus methodology and stated that subsequent salary reviews would be conducted in accordance with MGT's annual performance-evaluation structure, and that MGT later independently confirmed, re-offered, or implemented those compensation terms through post-effective writings and course of performance. Section 4.1 separately treats earned, unpaid wages and bonuses as Accrued Obligations.

83. The Offer Letter described a target bonus opportunity of up to $52,000, subject to performance and active-employment and good-standing conditions, and stated that allocations would follow historical Tambellini standards. Post-effective writings confirmed that Tambellini remained under a separate, pre-negotiated methodology; its 2025 goals were achieved; its pool was fully funded; MGT obtained manager recommendations and, on information and belief, paid other eligible Tambellini employees; and MGT stated that the new review would not affect CY25 bonuses. Plaintiff completed the period, remained employed at payment, and was not contemporaneously told he was ineligible or not in good standing.

84. MGT's post-effective manager guidance stated that FY26 merit increases would occur, would be effective October 1, 2025, and that eligible employees

would receive retroactive pay on December 23 and a merit-adjusted salary beginning January 2. Plaintiff completed the review period and remained employed through those dates, yet received a zero-percent increase and no retroactive merit pay. Plaintiff does not allege that every employee was guaranteed an increase. Alternatively, the post-effective bonus and merit communications constituted continuing compensation offers accepted through continued employment and performance. MGT partially performed by administering the compensation processes, obtaining recommendations, and paying or adjusting compensation for other eligible employees.

85. The March 21 LTIP communication stated that a 2025 EIU award would issue after finalization of the annual assessment if the performance and grant-date employment conditions were satisfied, while later cash realization remained contingent on a future financial event and continued employment through that event. Whether MGT finalized the assessment, selected a grant date, obtained approvals, was required to issue an award, or actually granted one is within its records.

86. MGT breached the operative FY25 bonus obligations by failing to calculate and pay any amount earned under the promised methodology. To the extent discovery shows that a merit adjustment effective October 1, 2025 was approved or otherwise became payable, MGT also breached by failing to pay the resulting

retroactive compensation. Plaintiff does not allege that an unapproved discretionary increase automatically vested. Alternatively, if the written LTIP terms required issuance of a 2025 award or MGT actually approved, allocated, or granted one, MGT breached by failing to issue, document, recognize, preserve, or restore it. Plaintiff does not allege immediate EIU cash conversion, a completed liquidity event, automatic vesting of target amounts, or vesting of the 2026 award.

87. Plaintiff seeks any earned FY25 bonus; any approved or otherwise payable retroactive FY26 merit compensation; issuance, restoration, preservation, or recognition of any 2025 EIU award shown to have been required or actually granted; other Accrued Obligations; prejudgment interest; and other legally recoverable direct or consequential damages proximately caused by the breach. Monetary EIU value is sought only to the extent governing contingencies matured or another surviving theory establishes that MGT wrongfully caused loss of the award or contingent value.

## COUNT V

## ALTERNATIVE BREACH OF CONTRACT—BAD-FAITH EXERCISE OF DISCRETION

## IN FY25 BONUS, FY26 MERIT, AND 2025 EIU ADMINISTRATION

## (IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

88. Plaintiff realleges paragraphs 16 through 41, 55 through 58, and 81 through 87.

89. This count is pleaded alternatively if MGT contends that the written compensation and retention arrangements gave MGT, Vicki Tambellini, the Board, executive leadership, or another decisionmaker material discretion over good standing, historical bonus standards, individual bonus allocation, merit eligibility, performance rating, salary-review administration, merit percentage or retroactive effective date, annual-assessment finalization, EIU grant date, approval, allocation, timing, or amount.

90. Any such discretion attached to identified written obligations: the FY25 bonus methodology stated in the Offer Letter and confirmed or implemented through post-effective writings; the Offer Letter's salary-review provision and MGT's post-effective merit communications; the separate Tambellini compensation arrangement; Section 4.1's treatment of earned wages and bonuses as Accrued Obligations; and the March 21 written EIU grant process. To the extent

those obligations left material discretion without fully defined standards, the implied covenant required honest and consistent exercise of that discretion and prohibited arbitrary or capricious conduct that destroyed the arrangements' reasonable value. This is not a free-standing workplace-fairness claim.

91. To the extent proved, MGT breached the bonus and merit obligations by applying undefined, undisclosed, retroactive, or selectively enforced eligibility, good-standing, rating, or merit criteria; departing from historical Tambellini methodology; assigning zero bonus and zero merit without a contemporaneous explanation of the criteria and determination producing those results; using a framework MGT said would not affect CY25 bonuses; failing to administer the salary review consistently with the promised evaluation structure; withholding any approved or otherwise payable retroactive adjustment; or otherwise administering discretion to deprive the compensation arrangements of their intended value.

92. To the extent proved, MGT breached the EIU obligations by unreasonably delaying or refusing to finalize the assessment, select or disclose a grant date, obtain required approvals, or issue a 2025 award after satisfaction of the business-performance condition; applying undisclosed or retroactive criteria; selectively timing the process to cause the grant-date employment condition to fail; or otherwise frustrating the written retention purpose. The governing Plan, award

agreement, approvals, schedules, allocation records, and valuation materials are within MGT's control.

93. Plaintiff does not invoke the covenant to contradict an express term, guarantee bonus or EIU target amounts, guarantee an unapproved merit increase, eliminate grant-date, liquidity-event, or continued-employment conditions, extend at-will employment, or create compensation or an award never earned. He does not allege a presently due EIU cash payment. As to EIUs, he seeks only legally available issuance, restoration, preservation, or recognition of a 2025 award that should have issued, and monetary relief only if governing contingencies matured or MGT's bad-faith conduct wrongfully caused loss of the award or contingent value.

94. Plaintiff seeks any earned FY25 bonus, any approved or otherwise payable retroactive FY26 merit compensation, the legally available EIU relief described above, other Accrued Obligations, prejudgment interest, and other direct or consequential damages legally recoverable, reasonably foreseeable, and proximately caused by the bad-faith exercise of contractual discretion, without duplicative recovery.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against MGT and the following relief, without duplicative recovery:

A. Judgment on Count I and on Counts II through V to the extent established by the evidence;

B. Under Count I, statutory back pay and lost compensation and benefits, including salary, retirement contributions, health benefits, the value of the Section 4.1 benefit to the extent caused by retaliation, and bonus, EIU, and other incentive opportunities subject to governing terms, less lawful mitigation offsets;

C. Front pay under Count I where legally available; compensatory damages; and punitive damages to the extent permitted and proved;

D. Under Count II, nominal damages, cure-period compensation and benefits, the Section 4.1 benefit and affected Accrued Obligations to the extent caused or wrongfully prevented by the breach, and other direct or consequential damages legally recoverable and proximately caused;

E. Under Count III, $86,262.50 in salary continuation, the economic value of up to six months of employee-rate group-health continuation, prejudgment interest, and other legally recoverable direct or consequential losses caused by wrongful prevention or hindrance;

F. Under Counts IV and V, any earned FY25 bonus; any approved or otherwise payable retroactive FY26 merit compensation; legally available issuance, restoration, preservation, or recognition of any 2025 EIU award shown to have been required, actually granted, or wrongfully withheld through bad-faith

discretion; other Accrued Obligations; prejudgment interest; and other direct or consequential damages proximately caused, with no immediate EIU cash recovery absent satisfaction or legally excused nonoccurrence of governing contingencies;

G. Appropriate equitable relief, including correction or supplementation of Plaintiff's employment records, a neutral-reference protocol, and legally available EIU-related declaratory or preservation relief;

H. Prejudgment and post-judgment interest, taxable costs, and any attorney's fees recoverable by law; and

I. All other relief the Court deems just and proper.

## DEMAND FOR A JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable and preserves all arguments concerning the scope and enforceability of Section 17 of the Employment Agreement.

Dated: August 24, 2026
Respectfully submitted,

GIANCARLO MONTJOY, Pro Se
816 NW 30th Street
Wilton Manors, Florida 33311
Telephone: (305) 490-4399 | Email: Montjoyg@aol.com